**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

NAPLETON AURORA IMPORTS, INC. d/b/a
NAPLETON'S VALLEY HYUNDAI, an
Illinois corporation; ED NAPLETON
CALUMET CITY IMPORTS, INC. d/b/a
NAPLETON RIVER OAKS HYUNDAI, an
Illinois corporation; NAPLETON
AUTOMOTIVE OF URBANA, LLC d/b/a
NAPLETON'S HYUNDAI OF URBANA, a
Florida corporation; NAPLETON CARMEL          CASE NO.: 1:24-cv-5668
MOTORS, LLC d/b/a NAPLETON HYUNDAI
OF CARMEL, an Illinois limited liability          JURY DEMAND REQUESTED
company; and NAPLETON HAZELWOOD
IMPORTS, LLC  d/b/a NAPLETON
HYUNDAI, an Illinois limited liability
company,

                      Plaintiffs,

     v.

HYUNDAI MOTOR AMERICA
CORPORATION, doing business as HYUNDAI
MOTOR NORTH AMERICA,

                      Defendant.

_____/

## **COMPLAINT**

Plaintiffs, NAPLETON AURORA IMPORTS, INC. d/b/a NAPLETON'S VALLEY

HYUNDAI, an Illinois corporation, ("VALLEY HYUNDAI"), ED NAPLETON CALUMET

CITY IMPORTS, INC. d/b/a NAPLETON RIVER OAKS HYUNDAI, an Illinois corporation

("RIVER OAKS HYUNDAI"), NAPLETON AUTOMOTIVE OF URBANA, LLC, a Florida

corporation d/b/a NAPLETON'S HYUNDAI OF URBANA ("URBANA HYUNDAI")

NAPLETON CARMEL MOTORS, LLC d/b/a NAPLETON HYUNDAI OF CARMEL, an

Illinois limited liability company ("CARMEL HYUNDAI"), and NAPLETON HAZELWOOD

IMPORTS, LLC d/b/a NAPLETON HYUNDAI, an Illinois limited liability company ("HAZELWOOD HYUNDAI") (collectively as "Plaintiffs" or "Napleton") sue Defendant HYUNDAI MOTOR AMERICA CORPORATION ("HMA"), and allege as follows:

## I.     <u>NATURE OF THE CASE</u>

1.     This case is about HMA's secret, illegal program to artificially inflate its publicly reported sales while giving Hyundai dealers who play ball a competitive advantage over dealers who refuse. On the backs of these false sales, HMA has issued press release after press release touting its increased year-over-year sales and its growth in the electric vehicle (EV) sector. Dealers who refuse to help HMA boost its fake numbers—like Napleton—are punished with allocations of slow selling vehicles, and denied wholesale price discounts, allocation, and retail price discounts to offer consumers, stifling competition and harming both Napleton and the public.

2.     HMA is the exclusive distributor of Hyundai motor vehicles in the United States and is wholly owned by the South Korean manufacturer, Hyundai Motor Company ("HMC"). HMA enjoys substantial economic power and leverage over its franchised dealers, including Napleton. Dealers like Napleton must invest substantial capital to start, operate, and maintain dealerships geared toward marketing and selling vehicles that HMA, and only HMA, distributes. But this investment depends on the good faith and fair dealing of HMA.

3.     Under pressure from its parent HMC, HMA places particular focus on the growth of sales volumes nationwide—or at least the appearance of increasing retail sales. HMC and HMA tout supposedly growing sales to the investing public, creditors, and partners in potential acquisitions.

4.     In particular, HMA has emphasized sales-volume growth in its Hyundai branded EVs, leading the public to believe these increasing EV sales are occurring organically because of the desirability of Hyundai EVs and customer demand for these vehicles.

5.      That is a false narrative. Instead of organic growth fueled by desirable vehicles and consumer demand, HMA created a multitiered scheme to cause its dealers to report false sales.

6.      These unlawful business practices include a secret program asking dealers to falsely report unsold vehicles as "sold" to a retail customer or placed into loaner service, only to reverse the "sale" the following month. One such request has been caught on tape, as described below and attached to this Complaint as Exhibit A.

7.      HMA rewards the compliant dealers with unlawful price discounts, preferred allocations of hot-selling models, "Flex-Cash" discount coupons to give to consumers, and other rewards and benefits. Dealers like Napleton—who refuse to engage in this unlawful conduct—are punished and denied these discounts, special allocations, coupons, and other benefits.

8.      On information and belief, these unlawful practices are occurring throughout HMA's United States operations and therefore represent a corporate policy and practice developed and approved at the highest levels of HMA, at HMC's direction.

9.      Napleton notified HMA's and HMC's upper management that it had discovered these practices and demanded that these fraudulent practices end. Demand unmet, this suit follows.

10.     As a result of HMA's unlawful and discriminatory practices, Napleton and other innocent dealers have been denied price discounts, allocation and other incentives and benefits. This has harmed consumers and Napleton, which has lost sales, revenue and profits.

11.      Napleton asserts several federal and state statutory and common law causes of action, seeking treble damages, injunctive and declaratory relief, attorney's fees, interest, and punitive damages to compensate Napleton for its losses and to deter HMA and HMC from engaging in these unlawful practices again.

12.     Napleton asserts the following claims: 1) that HMA engaged in unlawful price

discrimination in violation of the Robinson Patman Act (15 U.S.C. § 13(a)); 2) that HMA engaged in unlawful promotional discrimination in violation of 15 U.S.C. § 13(d) and (e); 3) that HMA violated the Illinois Motor Vehicle Franchise Act (815 ILCS § 710 *et seq.*); 4) that HMA violated Indiana's Franchise Act (IC § 23-2-2.7-2); 5) that HMA violated the Missouri Motor Vehicle Franchise Practices Act (Mo. Stat. § 407.810 *et seq.*); 6) that HMA breached each Plaintiff's Franchise Agreement; and 7) that HMA committed common law fraud.

II.  **PARTIES**

13.    Plaintiff VALLEY HYUNDAI is a corporation existing under the laws of the State of Illinois, is authorized to do business in the State of Illinois, and is an automobile dealer and "motor vehicle dealer" as defined in 815 ILCS § 710/4 *et seq.* Plaintiff VALLEY HYUNDAI's primary place of business is 4333 Ogden Avenue, Aurora, IL 60504.

14.    Plaintiff RIVER OAKS HYUNDAI is a corporation existing under the laws of the State of Illinois, is authorized to do business in the State of Illinois, and is an automobile dealer and a "motor vehicle dealer" as defined in 815 ILCS § 710/4 *et seq.* Plaintiff RIVER OAKS HYUNDAI's primary place of business is 1985 River Oaks Drive, Calumet City, IL 60409.

15.    Plaintiff URBANA HYUNDAI is a corporation existing under the laws of the State of Florida, is authorized to do business in the State of Illinois, and is an automobile dealer and a "motor vehicle dealer" as defined in 815 ILCS § 710/4 et seq. Plaintiff URBANA HYUNDAI's primary place of business is 1111 Napleton Way, Urbana, IL 61802.

16.    Plaintiff CARMEL HYUNDAI is a limited liability company existing under the laws of the State of Illinois, is authorized to do business in the State of Indiana, and is an automobile dealer and a "franchisee" of "motor vehicles" as those terms are defined under Indiana Code § 9-32-2-9.6. Plaintiff CARMEL HYUNDAI's primary place of business is 4200 E. 96th

Street, Indianapolis, IN 46240.

17.     Plaintiff HAZELWOOD HYUNDAI is a limited liability company existing under the laws of the State of Illinois, is authorized to do business in the State of Missouri, and is an automobile dealer and a "franchisee" of "motor vehicles" as those terms are defined under Mo. Stat. §§ 407.815(9) and (15). Plaintiff HAZELWOOD HYUNDAI's primary place of business is 649 Dunn Rd., Hazelwood, MO 63042.

18.     Each Plaintiff is a franchised Hyundai dealer engaged in, among other things, the business of purchasing Hyundai motor vehicles from HMA and reselling those vehicles mainly to retail purchasers. Plaintiffs operate their businesses under the written agreements with HMA referenced above, each known as Dealer Sales and Service Agreements ("Franchise Agreements").

19.     Defendant HMA is a California corporation with its principal place of business in Fountain Valley, California. HMA is authorized and doing business in Illinois, Indiana, and Missouri. HMA is the exclusive manufacturer, importer, and distributor of Hyundai motor vehicles in the United States and is a wholly owned subsidiary of HMC. HMA is a motor vehicle "Manufacturer" and a licensed "Distributor" of new, previously untitled Hyundai brand motor vehicles as defined in 815 ILCS § 710/2(k), a "Franchisor" as defined in Indiana Code § 9-32-15, and a "Distributor," "Franchisor," "Importer" and/or "Manufacturer" as defined in Mo. Stat. §§ 407.815(7), (10), (12) and (14).

20.     HMA is engaged in commerce by distributing and selling new and unused passenger cars and motor vehicles under the Hyundai brand. As of the beginning of 2024, Hyundai is the third-largest automaker in the world by unit production for the preceding two years.[1]

21.     HMA's business operations in the United States include the manufacture,

---

[1] https://www.kedglobal.com/automobiles/newsView/ked202401210003

distribution, and sale of motor vehicles and parts through its network of independent, franchised motor vehicle dealers. HMA is engaged in interstate commerce in that it sells vehicles through this network located in every state of the United States.

## III.  JURISDICTION AND VENUE

22.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1332. There is also complete diversity of citizenship in this case because Defendant HMA is a citizen of a different state from those of Plaintiffs, and the amount in controversy exceeds the sum of $75,000. *See* 28 U.S.C. § 1332. This Court also has supplemental jurisdiction over the state-law claims because those claims are integrally related to the federal claims and form part of the same case and controversy under 28 U.S.C. § 1367.

23.     This Court has personal jurisdiction over Defendant HMA because it transacts and does business in this district and because HMA is registered to do business in Illinois and Indiana. HMA transacts and does business in the State of Illinois and in this district and has engaged in statutory violations and common law tortious conduct in Illinois and in this district.

24.     Venue is proper pursuant to 28 U.S.C. § 1391(a) and (b) because a substantial part of the events or omissions giving rise to the claims occurred in this district. Venue is proper under 18 U.S.C. § 1965(a) and (b) because Defendant transacts business in this District, and the ends of justice require it. Venue is also proper in this district under 28 U.S.C. §1391(d) because Defendant HMA resides in this judicial district for venue purposes.

## IV.  HMA ENGAGES IN INTERSTATE COMMERCE

25.     HMA engages in the purchase, distribution, and sale of Hyundai brand motor vehicles throughout the United States.

26.     The vehicles that HMA acquires from HMC and sells to dealers like Napleton cross state lines between the time of their manufacture or import and their delivery to dealers. HMA

markets Hyundai brand vehicles throughout the United States on all forms of media and maintains a nationwide network of regional and local offices and representatives that interact with HMA's dealer network.

27.     HMA's principal source of revenue stems from the sale of new motor vehicles, parts and accessories in the United States to its network of independent franchised dealers (including Napleton). HMA's network of franchised dealers then resell the new Hyundai-brand motor vehicles, parts and accessories to the public and provide warranty and recall service for Hyundai-brand motor vehicles on behalf of HMA.

28.     Organizationally, HMA has divided its United States dealer network into "Regions." Plaintiffs' dealerships are in HMA's Central Region. Within each Region, Hyundai dealerships are divided into "Districts."

## V.     GENERAL ALLEGATIONS

### A.     The SRC Program and "Punching" RDRs

29.     When Plaintiffs sell new Hyundai vehicles, they report them as sold by electronically submitting a "Retail Delivery Report" or "RDR," to HMA. In industry jargon this is known an "punching" an RDR.

30.     An RDR contains information such as the customer's name, address, the vehicle purchased, and the date of the sale.

31.     The RDR also shows the type of sale; i.e., whether the sale is a "retail" sale to a consumer or a "fleet" sale to a business or governmental entity. HMA provides various categories that dealers are supposed to use to classify sales.

32.     On information and belief, HMA then uses data from RDRs submitted by dealers throughout the United States for purposes such as reporting sales to the press and investors.

33.     HMA has implemented a service loaner program known as the "SRC Program."

The SRC Program encourages dealers to convert some of its new car inventory into loaner vehicles that customers can drive while their vehicles are being serviced at the dealership.

34.     HMA provides sales codes for dealers to use when placing vehicles into the SRC Program. By completing a RDR using the applicable sales code, dealers notify HMA that they are placing vehicles into the SRC Program, which are supposed to be loaned or rented out to customers as alternate transportation when their vehicles are in the shop for repairs ("SRC Vehicles").

35.     Plaintiffs can report SRC Vehicles to HMA under either a "C-code" ("C-Code Vehicles") or "F-code" ("F-Code Vehicles").

36.     Vehicles reported as C-Code Vehicles are put into the service loaner fleet and immediately count towards the dealer's sales threshold for eligibility for the Performance Enhancement Program ("PEP"), which, as detailed below, HMA provides dealers per-vehicle price discounts for meeting sales objectives.

37.     "F-Code" Vehicles do not have to be immediately placed into loaner service and are not counted towards PEP. But HMA counts F-Code Vehicles for other purposes, including measuring the dealer's sales performance.

38.     Dealers have little incentive to designate their inventory as F-Code Vehicles. It is, in essence, a mechanism of last resort which, among other things, allows a dealer to place slow selling models into a category which avoids dragging down a dealer's sales performance.

39.     While dealers are supposed to use F-Codes to report placing qualifying vehicles into the SRC Program, HMA has used the F-Code essentially as a slush fund to artificially inflate its sales results provided to the public.

40.     In return for dealers "punching" false RDRs (i.e., submitting and then cancelling RDRs for SRC Program vehicles which, in fact, aren't used as loaners or rentals), HMA has

engaged in unlawful price and promotional discrimination, violated state laws, and breached its Franchise Agreements with Plaintiffs.

1.    **Punching Dealers Receive Better Allocation and Lower PEP Sales Objectives**

41.    PEP provides dealers with per-vehicle discounts between $750 and $1,500 for meeting certain sales objectives set by HMA. HMA calculates PEP objectives based on a dealer's historic sales with adjustments for a growth factor set by HMA and for the dealer's inventory available for sale.

42.    HMA falsely inflates the reported retail sales of Hyundai vehicles by pressuring its dealers to report and cancel non-SRC Vehicles as fake F-Code Vehicles. These fake F-Code Vehicles were, in fact, never intended to be part of the SRC Program and not used as service loaners.

43.    Dealers who participate in HMA's scheme (the "Punching Dealers") would punch vehicles as F-Code vehicles, which HMA then adds to its tally of monthly "sales" reported to the press. Later, when the car was sold to a retail customer, the Punching Dealer would then *cancel* the RDR for the fake F-Code.[2]

44.    Highlighting the ruse, HMA advised Punching Dealers to report slow selling EVs as F-Code Vehicles, which are particularly unsuited as loaners for the SRC Program because of lack of charging infrastructure, lack of range, and lack of customer familiarity with the product.

45.    HMA rewards Punching Dealers with allocation of fast-selling, desirable inventory that they would not have otherwise received but for their participation in HMA's unlawful scheme

---

[2] At the same time as HMA is soliciting its dealers to submit false RDRs, its sister company, Kia America, Inc. has instituted suit against one of its franchised dealers for submitting allegedly fake RDR reports, which Kia alleges is a fraudulent scheme. *See*, *KIA America, Inc. v. DMO Auto Acquisitions, LLC f/d/b/a Dan O'Brien Kia of Concord, et al.*, D.N.H., Case No.: 1:24-CV-00128-LM-AJ.

while, at the same time, penalizing dealers who elect not to participate in HMA's unlawful schemes (the "Non-Punching Dealers") by flooding them with a disproportionate number of slow selling EVs to exert additional pressure to coerce them to falsely report sales.

46. This fraudulent scheme—falsely reporting of F-Code Vehicles into the SRC Program and then cancelling that RDR, in exchange for allocation of fast selling and highly desirable Hyundai models—allows Punching Dealers to reach their sales objectives and receive PEP discounts more easily.

47. In addition, on information and belief, false F-Code punches reduce a Punching Dealer's "available" inventory and therefore lower that dealer's PEP objective. HMA lowers a dealer's PEP objective if it has a lower "available" inventory.

48. Therefore, Punching Dealers not only have artificially lower PEP objectives, they also receive better allocation with which to meet those lower objectives and benefit from the PEP price discounts to increase sales. The result is that Punching Dealers are able to more easily obtain the PEP price discounts due to HMA's punching scheme.

49. Siphoning off Hyundai's best-selling models to Punching Dealers not only makes it easier for them to obtain bonus money through PEP, it also leaves innocent dealers with a model-mix of vehicles which are less likely to sell, leaving them to compete for bonus money on an unlevel playing field.

50. Dealers like Napleton are left with higher availability, higher PEP objectives, higher prices, and inferior inventory with which to meet those objectives.

51. This has resulted in price discounts, incentives and subsidies being paid disproportionately to Punching Dealers in the markets where Plaintiffs compete. This destroys competition, as Punching Dealers, who reach their PEP objectives receive price discounts ranging

from $750 to $1,500 per vehicle.

52.    As a result, Punching Dealers are able to buy the same vehicles at a heavily discounted price as compared to Plaintiffs. Such price reductions afforded to Punching Dealers are not functionally available to Plaintiffs because Plaintiffs are not involved in the fraudulent and illegal scheme to falsely report F-Code Vehicles into the SRC Program.

53.    Without the benefit of any discovery, Napleton has uncovered evidence demonstrating the existence of this scheme. For example, on or about May 31, 2024, HMA's representative, HMA District Sales Manager, Chris Pilon, telephoned CARMEL HYUNDAI's General Manager, Dean Saidai. A copy of the transcript of that recorded call is attached as Exhibit A. In that call, Mr. Pilon made the following statements (emphases added):

- That Mr. Pilon had a "favor/proposition slash um awkward thing to ask" advising Mr. Saidai that he was "up against a number" he was "trying to hit" and that he was "tasked" to do so by getting dealers to increase the numbers of vehicles being put into the SRC Program, that "desperate times call for desperate measures" and that he was "**kinda up against a wall we gotta hit a number for the press and for the Koreans.**"

- Because PEP normally encourages dealers to put C-Code Vehicles into the SRC Program as they count towards incentive eligibility, Mr. Pilon said that he was also tasked with putting additional vehicles into the SRC Program as F-Code Vehicles.

- He stated that he felt "**slimy for even proposing this**," but HMA was asking dealers to "**steal some inventory**." In other words, inventory that would have been allocated to Non-Punching Dealers are instead diverted to Punching Dealers who will report them as fake F-Code Vehicles, only to later be reversed and sold to retail customers.

- As a quid pro quo for participating in this scheme, the dealership would receive extra inventory of HMA's faster selling gas powered/hybrid models such as Santa Fe plus a mix of other cars, Kona, Elantra, Tucson, Palisades and Santa Cruz models.

- Excluded from this allocation would be Ioniqs, HMA's slow selling EV model. In fact, Mr. Pilon suggested that Ioniqs are exactly the kind of car that they would want to designate as an F-Code Vehicle, as they are particularly unsuited for service loaners compared to gas powered models.

    **2.    Flex-Cash for Punching**

54.    In addition to preferential allocation and lower PEP objectives, HMA provides an

additional reward to Punching Dealers known as "Flex-Cash."

55.     Flex-Cash are essentially coupons that HMA gives to favored dealers to provide discounts on the price of new motor vehicles.

56.     For example, if HMA provides a dealer with five Flex-Cash coupons each with a face value of $500 per coupon, the dealer can use these coupons to provide additional discounts the customer would otherwise not receive. In this example, the dealer could elect to provide five customers with additional discounts of $500 each, give one customer two Flex-Cash for a $1,000 discount, or some other combination at the dealer's discretion.

57.     Not all dealers receive the same number of Flex-Cash coupons. On information and belief, Punching Dealers receive more Flex-Cash coupons based on the number of vehicles they agree to punch as F-Code Vehicles as well as the particular models they agree to punch as F-Code Vehicles.

58.     HMA uses Flex-Cash coupons to reward Punching Dealers and punish Non-Punching Dealers. Flex-Cash represents a dollar-for-dollar reduction in the retail price consumers pay for Hyundai vehicles but is not available to all dealers (or their customers) on proportionally equal terms. Rather, Flex-Cash coupons go disproportionately to customers of Punching Dealers.

### 3.     False Punching Artificially Inflates HMA's Sales

59.     On information and belief, HMA's unlawful RDR punching scheme (the "RDR Punching Scheme") has been implemented in the Central Region at the direction of Tia Battle, HMA's Central Region General Manager, and Bob Kim, HMA's Vice President, East Sales.

60.     On information and belief, HMA personnel in each of the Regions has engaged in the RDR Punching Scheme in one form or another.

61.     HMA directly benefits from the RDR Punching Scheme, by inflating HMA's monthly sales, which, in turn, creates the appearance that HMA's (and its parent HMC's) sales

performance is better than it is.

62.    The over-reporting of sales of Hyundai's EVs was clearly a goal of this scheme, as shown by a recent LinkedIn post by HMC's Global President and Chief Operating Officer Jose Munoz:[3]



---

[3]  *See also*  https://www.businesskorea.co.kr/news/articleView.html?idxno=218742  touting  this entirely false narrative of robust EV sales bolstered by HMA's false reporting scheme.

63. The RDR Punching Scheme has artificially inflated HMA's non-EV sales too, as shown by another recent LinkedIn post by Mr. Munoz:



64. Absent from Mr. Munoz's LinkedIn posts is that the RDR Punching Scheme is behind these inflated sales numbers and that HMA secretly rewards Punching Dealers at the expense of innocent dealers and their customers.

65.     Following its investigation, Napleton informed HMA: 1) that Napleton uncovered the unlawful RDR Punching Scheme; and 2) that Napleton has not and will not participate in the RDR Punching Scheme.

66.     HMC and HMA intended and knew that Non-Punching Dealers would be harmed and directly injured by the scheme, creating a multiple-tiered pricing and promotional system, in which Non-Punching Dealers and their customers pay much more for new Hyundai motor vehicles.

67.     HMA's unlawful conduct has directly injured Napleton, its customers, and the public, and continues to do so.

68.     The RDR Punching Scheme harms competition by sabotaging the ability of Non-Punching Dealers to compete for consumers' business. Non-Punching Dealers are denied the necessary inventory and wholesale price discounts that would allow them to compete on an even playing field with Punching Dealers. This not only drives down sales for Non-Punching Dealers, but also drives up prices for consumers overall.

69.     At all relevant times, HMC and HMA were aware of the false RDR Punching Scheme and have routinely attempted to avoid its detection by requiring that Punching Dealers disguise the scheme by reporting them as F-Code Vehicles when such vehicles were neither used as loaners nor sold to a retail customer until the F-Code punch was cancelled.

**COUNT I**
**(Violation of Section 2(a) of the Robinson-Patman Act—15 U.S.C. § 13(a))**
**Brought by All Plaintiffs against HMA**

70.     Plaintiffs re-allege each allegation in the preceding paragraphs.

71.     At all relevant times to this action, Plaintiffs and HMA were and are persons engaged in interstate commerce within the meaning of 15 U.S.C. § 13 of the Robinson-Patman

Act in that the vehicles sold to Plaintiffs and to Punching Dealers in the relevant markets crossed state lines.

72.     The vehicles sold to Plaintiffs and Punching Dealers in each relevant market were of like grade and quality.

73.      Through the RDR Punching Scheme and PEP, HMA discriminated in price between Plaintiffs and Punching Dealers in each relevant market who received incentives and subsidies not functionally available to Plaintiffs. Such discrimination in price was for products of like grade and quality.

74.     The effect of the above price discrimination was to injure, destroy, and prevent competition to the advantage of Punching Dealers in each relevant market who received incentives and subsidies not functionally available to Plaintiffs.

75.     The relevant markets include the Central Region, each District in which each Plaintiff is located and each Designated Marketing Area ("DMA") in which each Plaintiff is located.

76.     The PEP discounts paid to Punching Dealers were not functionally available to Plaintiffs.

77.     The above price discrimination violates 15 U.S.C. § 13(a) of the Robinson-Patman Act.

78.     As a direct result of HMA's violations of 15 U.S.C. § 13(a), Plaintiffs have sustained injury to their businesses and property in the form of, among other things, lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost customer goodwill, lost market value as going concerns, lost marketing monies, lost potential

future sales of vehicles to repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at the same dealership where they were purchased. Plaintiffs have incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment against Defendant HMA and grant Plaintiffs the following relief:

(a)     Adjudge and decree that Defendant HMA has unlawfully breached Section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a);

(b)     Award treble damages, pursuant to 15 U.S.C. § 15(a),  that are shown to have been sustained by Plaintiffs by reason of Defendant HMA's above-alleged violations, plus interest, costs, and reasonable attorney's fees; and

(c)     Grant Plaintiffs such other further and different relief as the nature of the case may require or as the Court may deem just and proper.

**COUNT II**
**(Violation of Sections 2(d) and 2(e) of the Robinson-Patman Act —15 U.S.C. §§ 13(d) and (e))**
**Brought by All Plaintiffs against HMA**

79.     Plaintiffs re-allege each allegation in the preceding paragraphs.

80.     HMA's Flex-Cash coupons are promotional services which have been provided to Punching Dealers as a direct reward for falsely reporting sales.

81.     As part of the RDR Punching Scheme, HMA has not made Flex-Cash coupons available on proportionally equal terms to Non-Punching Dealers like Plaintiffs, because of their refusal to participate in the RDR Punching Scheme.

82.     Plaintiffs compete with Punching Dealers for the same customers, in the same geographic areas and at the same functional level. Plaintiffs and Punching Dealers all compete for customers looking to buy Hyundai vehicles, in Illinois, Indiana, and Missouri, through their

Hyundai dealerships.

83.     The RDR Punching Scheme, in particular Flex-Cash, impedes competition because customers who go to Punching Dealers are more likely to pay less for a vehicle than if they buy a vehicle from Non-Punching Dealers such as Plaintiffs.

84.     The disproportionate distribution of Flex-Cash also impedes competition because Punching Dealers who receive it are put at an advantage by the benefits they receive as a result of increased volume of sales generated by their ability to offer HMA's products at a lower price.

85.     Besides Flex-Cash coupons, HMA's preferential allocation of desirable, fast-selling inventory to Punching Dealers in exchange for participating in the RDR Punching Scheme are promotional services that are not made to Non-Punching Dealers on a proportionally equal basis.

86.     These preferred allocations are not available to Non-Punching Dealers like Plaintiffs, who HMA instead provided slower selling, undesirable inventory that they neither want nor need.

87.     HMA's allocation practices harm the public. As a result of these practices, consumers are left with less choice and benefit from less competition because desirable inventory is concentrated in the hands of Punching Dealers, who can sell the scarce vehicles at higher profits.

88.     15 U.S.C. § 13(d) makes it unlawful for "any person engaged in commerce to pay or contract for the payment of anything of value or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other

customers competing….” 15 U.S.C. § 13(d).

89.     15 U.S.C. § 13 (e) makes it unlawful for “any person to discriminate in favor of one purchaser against another purchaser… of a commodity bought for resale… by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms.” 15 U.S.C. § 13(e).

90.     On information and belief, HMA has discriminated in awarding Flex-Cash coupons and discretionary allocation in disproportionate measure to Punching Dealers for false sales reporting. Plaintiffs have suffered harm and are entitled to declaratory and injunctive relief, compensatory and punitive damages, attorney’s fees, costs, expenses and any other relief which the Court considers fit and necessary.

91.     As a direct result of HMA’s violations of 15 U.S.C. § 13(d) and (e), Plaintiffs have sustained injury to their businesses and property in the form of, among other things, lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost customer goodwill, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at the same dealership where they were purchased. Plaintiffs have incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment against Defendant HMA, and grant Plaintiffs the following relief:

(a)     Adjudge and decree that Defendant HMA has unlawfully breached Section 2(d)

and 2(e) of the Robinson-Patman Act, 15 U.S.C. §§ 13(d) and (e);

(b)      Award treble the damages, pursuant to 15 U.S.C. § 15(a), that are shown to have
been sustained by Plaintiffs by reason of Defendant HMA's above-alleged
violations, plus interest, costs, and reasonable attorney's fees; and

(c)      Grant Plaintiffs such other further and different relief as the nature of the case may
require or as the Court may deem just and proper.

### COUNT III
### (Violation of Illinois Motor Vehicle Franchise Act (815 ILCS 710 *et seq.*))
### Brought by Valley Hyundai, River Oaks Hyundai and Urbana Hyundai against HMA

92.      Plaintiffs re-allege each allegation in the preceding paragraphs.

93.      VALLEY HYUNDAI, RIVER OAKS HYUNDAI and URBANA HYUNDAI
(collectively, the "Illinois Plaintiffs") are each "motor vehicle dealers" as that term is defined under
the Illinois Motor Vehicle Franchise Act.

94.      HMA is a "franchisor" as that term is defined under the Illinois Motor Vehicle
Franchise Act.

95.      Each of the Franchise Agreements between HMA and the respective Illinois
Plaintiffs is a "franchise" as that term is defined under the Illinois Motor Vehicle Franchise Act.

96.      Section 710/4(b) of the Illinois Motor Vehicle Franchise Act provides that it is
unlawful for a manufacturer and/or distributor, such as HMA, "to engage in any action with respect
to a franchise which is arbitrary, in bad faith or unconscionable and which causes damage to any
of the parties or to the public."

97.      Through the RDR Punching Scheme, HMA's conduct toward the Illinois Plaintiffs
has been arbitrary, in bad faith, and/or unconscionable and caused damage to the Illinois Plaintiffs
or to the public.

98. Section 710/4 further provides that it is unlawful for HMA:

(d)(1) to adopt, change, establish or implement a plan or system for the allocation and distribution of new motor vehicles to motor vehicle dealers which is arbitrary or capricious or to modify an existing plan so as to cause the same to be arbitrary or capricious;

99. The preferred allocation offered to Punching Dealers is a wrongful and arbitrary and capricious plan or system for the allocation and distribution of new motor vehicles under 815 ILCS 710/4(d)(1). HMA unlawfully adopted, implemented, or modified a plan or system for the allocation and distribution of new motor vehicles which is or has become arbitrary and capricious. HMA allocated vehicles to dealers willing to engage in HMA's scheme to falsely report vehicle sales. This wrongful conduct by HMA diverted sales from Illinois Plaintiffs and eroded the value of the Illinois Plaintiffs' businesses.

100. HMA has also violated 815 ILCS 710/4(e)(2), which prohibits HMA from offering to sell or selling vehicles to other Illinois dealers at lower prices than offered to Napleton. Subdivision (e)(2) prohibits HMA from using "any device, including, but not limited to, sales promotion plans or programs which result in such lesser actual price or fail to make available to any motor vehicle dealer any preferential pricing, incentive, rebate, finance rate, or low interest program…"

101. The RDR Punching Scheme is a "device" that lowers the price for vehicles for Punching Dealers at the expense of Non-Punching Dealers like the Illinois Plaintiffs.

102. HMA's wrongful actions resulted in damage to Illinois Plaintiffs, including, but not limited to, lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost customer goodwill, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to repeat customers, and lost profits from

warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at the same dealership where they were purchased. Illinois Plaintiffs have also incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined. If allowed to continue, HMA's actions will result in further loss of the Illinois Plaintiffs' money or property.

103.    Each of HMA's wrongful actions were and are willful and wanton.

**WHEREFORE**, the Illinois Plaintiffs demand entry of a judgment against HMA for

(a)    Treble damages in an amount to be determined at trial;

(b)    Costs of suit including reasonable attorney's fees; and

(c)    Such other relief as this Court deems just and equitable.

### COUNT IV
### (Violations of Indiana Franchise Act—Indiana Code § 23-2-2.7-2)
### <u>Brought by Carmel Hyundai against HMA</u>

104.    Plaintiffs re-allege each allegation in the preceding paragraphs.

105.    HMA is a "franchisor" as that term is defined under Indiana Code § 9-32-15.

106.    Plaintiff, CARMEL HYUNDAI, is a "Dealer" under Indiana Code § 9-32-2-9.6.

107.    The Franchise Agreements between HMA and Plaintiff, CARMEL HYUNDAI, is a "franchise agreement" of under Indiana Code § 23-2-2.7-2.

108.    Indiana Code § 23-2-2.7-2(5) provides that a franchisor is prohibited from "(d)iscriminating unfairly among its franchisees or unreasonably failing or refusing to comply with any terms of a franchise agreement."

109.    Indiana Code § 23-2-2.7-2(8) provides that a franchisor is prohibited from "[u]sing deceptive advertising or engaging in deceptive acts in connection with the franchise or the franchisor's business."

110.     HMA's violations of Indiana Code § 23-2-2.7-2 will, can, or have adversely and pecuniarily affected Plaintiff, CARMEL HYUNDAI.

111.     As explained in detail above, HMA has engaged in a scheme to falsify and inflate the reports of new vehicle sales in Indiana and elsewhere.

112.     HMA has also unlawfully established a system for the allocation and distribution of motor vehicles to Plaintiff, CARMEL HYUNDAI which is unfair, inequitable, unreasonably discriminatory, or not supportable by reason and good cause after considering the equities of Plaintiff, CARMEL HYUNDAI. HMA allocated vehicles to dealers who were provided price discounts not functionally available to Plaintiff, CARMEL HYUNDAI, and allocated other vehicles as kickbacks to Punching Dealers. This wrongful conduct diverted sales from Plaintiff, CARMEL HYUNDAI, and eroded the value of its business.

113.     HMA's wrongful actions are discriminatory and deceptive under Indiana Code §§ 23-2-2.7-2(5) and (8).

114.     Each of HMA's wrongful actions resulted in damage to Plaintiff CARMEL HYUNDAI, including, but not limited to, lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost customer goodwill, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at the same dealership where they were purchased. In addition, CARMEL HYUNDAI has incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined. If allowed to continue, HMA's actions will result in further loss of Plaintiff CARMEL HYUNDAI's money or property.

**WHEREFORE**, pursuant to Indiana Code § 23-2-2.7-2 Plaintiff CARMEL HYUNDAI demands entry of a judgment against HMA for:

      (a)      Damages in an amount to be determined at trial;

      (b)      Costs of suit including reasonable attorney's fees; and

      (c)      Such other relief as this Court deems just and equitable.

**COUNT V**
**(Violations of Missouri Motor Vehicle Franchise Practices Act—Mo. Stat. § 407.825)**
**Brought by Hazelwood Hyundai against HMA**

115.     Plaintiffs re-allege each allegation in the preceding paragraphs.

116.     HMA is a "Distributor," "Franchisor," "Importer" and/or "Manufacturer" as those terms are defined under Mo. Stat. §§ 407.815(7), (10), (12), and (14).

117.     Plaintiff, HAZELWOOD HYUNDAI, is a "Franchisee" under Mo. Stat. § 407.815(9).

118.     The Franchise Agreements between HMA and Plaintiff, HAZELWOOD HYUNDAI, is a "Franchise" under Mo. Stat. § 407.815(8).

119.     Mo. Stat. § 407.825 defines certain enumerated acts by franchisors as unlawful under Missouri law.

120.     Mo. Stat. § 407.825(18) makes it unlawful for HMA to fail or refuse "to sell to all franchisees for a line-make reasonable quantities of every motor vehicle sold or offered for sale to any franchisee of that line-make."

121.     By tying allocation to participation in HMA's unlawful RDR Punching Scheme, HMA has failed and/or refused to sell reasonable quantities of Hyundai motor vehicles to HAZELWOOD HYUNDAI.

122.     Mo. Stat. § 407.825(28) makes it unlawful for HMA to fail "to make practically

available any incentive, rebate, bonus or other similar benefit to a franchisee that is offered to another franchisee of the same line-make" in Missouri.

123.    Flex-Cash coupons and PEP incentives each are an "incentive," "rebate," "bonus," "or other similar benefit" under Missouri law and HMA has failed to make them "practically available" to HAZELWOOD HYUNDAI because it has refused to participate in the RDR Punching Scheme.

124.    Mo. Stat. § 407.825(31) makes it unlawful for HMA to "[u]nreasonably discriminat[e] among its franchisees in any program that provides assistance to its franchisees…"

125.    Flex-Cash coupons and PEP each a program "that provides assistance" to Hyundai dealers in Missouri, and HMA has acted in an unreasonably discriminatory manner against HAZELWOOD HYUNDAI because it does not participate in the RDR Punching Scheme.

126.    Mo. Stat. § 407.825(41) makes it unlawful for HMA to establish or implement "a plan or system for the allocation, scheduling, or delivery of new motor vehicles…that is not fair, reasonable, and equitable or modifying an existing plan or system so as to cause the plan or system to be unreasonable, unfair, or inequitable."

127.    HMA's allocation of vehicles based on participation in the RDR Punching Scheme is not a "fair, reasonable, and equitable" plan or system of allocation.

128.    Each of HMA's wrongful actions resulted in damage to Plaintiff HAZELWOOD HYUNDAI, including, but not limited to, lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost customer goodwill, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle

owners who tend to have their vehicles serviced at the same dealership where they were purchased. In addition, the HAZELWOOD HYUNDAI has incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined. If allowed to continue, HMA's actions will result in further loss of Plaintiff HAZELWOOD HYUNDAI's money or property.

**WHEREFORE**, pursuant to Mo. Stat §§ 407.825 and 407.835 Plaintiff HAZELWOOD HYUNDAI demands entry of a judgment against HMA for:

      (a)    Damages in an amount to be determined at trial;

      (b)    Costs of suit including reasonable attorney's fees; and

      (c)    Such other relief as this Court deems just and equitable.

**COUNT VI**
**(Breach of Franchise Agreements)**
**<u>Brought by All Plaintiffs against HMA</u>**

129.    Plaintiffs re-allege each allegation in the preceding paragraphs.

130.    HMA entered into Franchise Agreements with each Plaintiffs in exchange for valuable consideration.

131.    Plaintiffs have performed all material obligations under their Franchise Agreements at all relevant times.

132.    HMA incorporates a set of Standard Provisions into their Franchise Agreements. A copy of HMA's Standard Provisions is attached as Exhibit B.

133.    Section 10.A.1 of these Standard Provisions requires HMA to allocate its vehicles in a fair and equitable manner stating that "HMA and DEALER recognize that certain Hyundai Products may be in short supply from time to time because of factors which are beyond the control of HMA or FACTORY … (defined in the Standard Provisions as Hyundai Motor Company) … Where such a shortage is determined by HMA to exist, HMA will endeavor to allocate the affected

Hyundai Product(s) among its Dealers in a fair and equitable manner, as it may determine its sole discretion."

134.     HMA repeatedly breached Section 10 of the Standard Provisions of each of the Franchise Agreements when it intentionally failed to allocate vehicles to Plaintiffs in a fair and equitable manner. Rather, HMA allocated vehicles to dealers as kickbacks to Punching Dealers who participated in HMA's RDR Punching Scheme to falsely report vehicle sales. This wrongful conduct diverted sales from Plaintiffs and eroded the value of Plaintiffs' businesses.

135.     HMA also failed to exercise its discretion under the Franchise Agreements honestly or in good faith and has actively circumvented the rights these agreements granted to Plaintiffs and the parties' reasonable expectations thereto.

136.     Plaintiffs reasonably expected that the Franchise Agreements would permit them to fairly compete against other Hyundai dealers. Instead, HMA breached (and continues to breach) the Franchise Agreements by actively, underhandedly, and dishonestly stacking the deck against Plaintiffs, withholding PEP discounts, Flex-Cash coupons and preferred vehicle allocations from Plaintiffs.

137.     HMA's conduct has eroded the value of, and otherwise damaged, Plaintiffs' businesses, including lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost customer goodwill, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at the same dealership where they were purchased. Plaintiffs have also incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be

determined.

      **WHEREFORE**, Plaintiffs demand entry of a judgment against HMA for Damages resulting from HMA's breaches, in an amount to be determined at trial, costs of suit including reasonable attorney's fees and such other relief as this Court deems just and equitable.

**COUNT VII**
**(Common Law Fraud)**
**<u>Brought by All Plaintiffs against HMA</u>**

      138.    Plaintiffs re-allege each allegation in the preceding paragraphs.

      139.    At all relevant times, HMA represented to its dealers, including Plaintiffs, that its metrics to determine performance and allocation, as well as its incentive and discount programs, are applied uniformly, fairly, without bias, and in good faith. HMA knew that those representations were material and false.

      140.    At all relevant times, HMA willfully failed to disclose that it was falsely increasing its monthly sales throughout the country to give the appearance of financial strength to its dealers and inducing Plaintiffs to make substantial investments including with respect to their facilities and promotions.

      141.    The misrepresentations and omissions of material fact described above were false, misleading, with knowledge of their falsity and with the intent that Plaintiffs, as well as the investing community and the press, would believe, rely, and act on them, thereby causing Plaintiffs to lose sales revenues and profits.

      142.    Because of the fraudulent misrepresentations and omissions described above, Plaintiffs have been directly damaged, and will continue to be damaged, from lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales,

lost customer goodwill, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at the same dealership where they were purchased. Plaintiffs have also incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined.

**WHEREFORE**, Plaintiffs demand entry of a judgment against HMA for damages, including punitive damages, costs of suit including reasonable attorney's fees, and such other relief as this Court deems just and equitable.

**<u>Jury Trial Demand</u>**

Plaintiffs demand trial by jury of all matters so triable.

Dated: July 5, 2024                                   Respectfully submitted,

                                                      **ARENTFOX SCHIFF LLP**

                                                      By:    */s/ Mir Y. Ali*
                                                      Mir Y. Ali, Esq.
                                                      233 S. Wacker Dr., Suite 7100
                                                      Chicago, IL 60606
                                                      Tel: (312) 258-5500

                                                      Russell P. McRory, Esq. (*pro hac vice*
                                                      *forthcoming*)
                                                      1301 Avenue of the Americas, Fl. 42
                                                      New York, NY 10019
                                                      Tel: (212) 484-3900

Of Counsel:

Leslie Stracher, Esq.
General Counsel
Napleton Automotive Group
1 Oakbrook Terrace, Suite 600
Oakbrook Terrace, IL 60181
Tel: (630) 530-3955